which renders the employment of so many men unnecessary, and to invite a discussion of this matter between the head of the department and his subordinate."

Concerning the grounds of the relator's removal, the record, as I have stated, discloses an unequivocal affirmation on the part of the defendant that relator was discharged because there was no work for him to do, and that, if continued therein, relator's position would be a sinecure; that no one had been appointed to fill the position from which relator had been removed, and no money had been provided for the compensation of any incumbent of such a position.

[3] We have repeatedly held that under such circumstances the heads of New York City departments may lawfully remove or suspend employés thereof (People ex rel. Kaufman v. Board of Education, 166 App. Div. 58, 151 N. Y. Supp. 585; People ex rel. Vincing v. Hayes, 135 App. Div. 19, 119 N. Y. Supp. 808; People ex rel. Griffin v. Williams, 153 N. Y. Supp. 926), and I cannot doubt that state officers have similar power. In every case the record should be carefully examined for the purpose of ascertaining whether any evidence of an abuse of power is disclosed; but where there is none, and where the good faith of the defendant satisfactorily appears, mere allegations of bad faith, or that the discharge was for reasons not countenanced by law, should not be accepted as sufficient to raise an issue of fact.

The order directing the issuance of a peremptory mandamus should be reversed, with $10 costs and disbursements, and the motion denied, with $10 costs. All concur.

---

HENDRICKSON v. O'BRIEN CONST. CO.   (No. 7558.)

(Supreme Court, Appellate Division, First Department.   July 9, 1915.)

MASTER AND SERVANT ☞286—EMPLOYERS' LIABILITY ACT—PRIMA FACIE CASE—DIRECTING VERDICT.

In an action under the Employers' Liability Act (Consol. Laws, c. 31), evidence *held* sufficient to establish a prima facie case for plaintiff as to an act of negligence on the part of defendant's foreman for which it was liable, making it error to direct a verdict.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ☞286.]

Ingraham, P. J., dissenting.

Appeal from Trial Term, New York County.

Action by Henry Hendrickson against the O'Brien Construction Company. From a judgment entered on dismissal of his complaint, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Wilcox & Brodek, of New York City (Charles A. Brodek, of New York City, of counsel, and Harrie C. Manheim, of New York City, on the brief), for appellant.

James B. Henney, of New York City (Edward F. Lindsay, of New York City, of counsel), for respondent.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CLARKE, J. This is an action under the Employers' Liability Act. The plaintiff was 40 years of age, a Finn, who had been in this country 22 years, a carpenter. The defendant was engaged in the building of the subway at Morris Park. The plaintiff had been employed about a week and a half working on top of the subway. He was ordered underground by the foreman. There was a concrete base in the subway about two or three feet high. There were iron uprights or posts on this base. He was directed to go with 15 other men to bring a form over. The form was an open boxlike structure, when completed, 20 feet long, 5 feet 6 inches in height, wider at the bottom than at the top, placed on the concrete base, in which concrete was poured. When the concrete set, the sides of the form were taken off, and left a divisional wall tapering from the bottom to the top. Two of the sides of the form—that is, the panels—were carried one at a time by the plaintiff and the 15 other men with him to this concrete base, where they were directed to place it, and were stood up leaning against the posts—as he said, like a board fence leaning against the posts. In the process of preparing this form for the reception of the concrete, the panels were kept apart by spreaders which were nailed between the two. They were kept together by wires which were laced from railings which were nailed at the top and at the bottom. The spreaders kept the space open for the concrete; the wires bound the sides together, so that it held the concrete until it set.

After the two panels had been so placed upon the base, leaning up against the posts, plaintiff testified that he received instructions from the foreman to get the railing pieces—crosspieces that were to be nailed on the outside of the form. Three men went with him to get these pieces. They went around looking for them; they were not supplied in any particular place; they had to look for them. He was picking them up here and there. He was away from this panel about 15 or 20 minutes. The two men that went for the railing pieces with him, and he, started to put the railing pieces on at the same time. They put on the lower pieces by nailing them fast. Then they started to put the top ones on. The position he occupied as they nailed them on was to hold the top of the form with the left hand. His feet were on the lower railing piece. The hammer was in his right hand; he was holding on that way, using the hammer with his right hand. The other men occupied the same position in holding on these top pieces. He had never worked on any of these forms before. He could not reach the top pieces to nail them on from the concrete base. There was no ladder supplied, or scaffold. When he was nailing these top pieces, the form fell over on him, and he received the injuries complained of. He testified that, when the foreman sent him away to get the railings, he said:

" 'Get the railing pieces, and, as soon as you find them, put them on. We will fix the forms by the time you will be back.' Q. What did you understand him to mean when he said, 'We will fix the forms?' A. That he would set the forms in their places, and have the forms all fixed by the time we would be back with the railing pieces. * * * Q. Whether the form was fastened, or whether the spreaders were in, whether the wires were fastened in these, or whether the form was in position, or whether anything was holding it or

not, you didn't pay any attention? A. There was no way to see it, whether there were spreaders in or not. .I could not see whether the spreaders were in, but I didn't look to see whether they were or not. There was no way to see it if they were in, the spreaders. * * * I thought they were all fixed. * * * Q. When you got back the form was just in the same position as it was when you left, the one that fell on you? A. I think it was, but I was not sure, because I didn't look. Q. It was in the same place, wasn't it? A. He ordered us away, and told us it will be all fixed when we come back, and I thought it was all fixed. Q. What do you mean by 'all fixed'? A. All secure. * * * He said: 'We will have it all fixed at the time when you fellows come back.' * * * He said: 'Hurry up and get the railings, and we will have it all fixed.' * * * I done just what he told us. I hurried up and got the rails, and we started to get the form ready for the concrete, and before we got it ready, and before we got it fastened, or wired, it fell on me, and that is what happened. * * * Just before I was hurt, the foreman told me to get the railing pieces. He said: 'As soon as you find them, put them on.' I was putting them on when I was hurt."

One of the men who was working with him testified that he received instructions from the foreman. He said:

" 'Go ahead and get the railing pieces, and we will get the form ready for you when you get back.' We were away from the form while we were looking for these railing pieces about 10 or 15 minutes. When we got back there was nobody at the form. We started to put on the railing pieces. * * * He told us to go and get the railing pieces, and he would have the form already set when we got back."

It seems to me that there was a question presented as to whether or not the plaintiff had a right to rely upon his foreman's order to go and get the railing pieces and as quick as he got them to nail them on; by the time he got there they would be fixed and secure, so they could get to work on them. If the foreman did state that, as two witnesses testified, and he did not fix the forms so that they were safe for the performance of the work which he had ordered, then a question would have been presented to the jury as to whether or not there was an act of negligence on the part of the foreman or superintendent for which the defendant was liable. It seems to me that a prima facie case was made out, which required the defendant to put in its evidence, and therefore it was error to dismiss the complaint at the close of the plaintiff's case.

The judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. Order filed.

SCOTT, DOWLING, and HOTCHKISS, JJ., concur. INGRAHAM, P. J., dissents.